**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:06 CV 222-C**

| | | |
|---|---|---|
| ROBERT FRANKLIN PINKSTON c/b/a PINKSTON SALES & SERVICE and PINKSTON'S LAWNMOWER AND EQUIPMENT, INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **MEMORANDUM AND RECOMMENDATION AND ORDER** |
| OUTDOOR EQUIPMENT DISTRIBUTORS, INC., STI TURF CARE & EQUIPMENT, LLC, ROBERT L. ZUCKER, JR., MATTHEW J. MACHTAY, and LORI WHITE, individuals, EXMARK MANUFACTURING COMPANY, INC., a foreign corporation, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**THIS MATTER** is before the Court on the following motions and memoranda:

1. the Defendant STI Turf Care & Equipment, LLC's "Motion to Dismiss Plaintiffs' Second Amended Complaint and Memorandum of Law in Support Thereof" (document #51) filed on September 21, 2006;

2. the Defendants Outdoor Equipment Distributors, Inc., Robert L. Zucker, Jr., Matthew J. Machtay, and Lori White's "Motion to Dismiss Second Amended Complaint . . ." and ". . . Memorandum in Support . . ." (document ##52-53) filed on September 21, 2006;

3. the Defendant Exmark Manufacturing Company, Inc.'s ". . . Motion to Dismiss . . ." and ". . . Memorandum in Support . . ." (document ##54-55) filed on September 22, 2006;

4. the Plaintiffs' "Memorandum in Opposition . . ." (document #59) filed on October 24,

2006;

5. the Defendant STI Turf Care & Equipment, LLC's "Reply Brief . . ." (document #61) filed on November 1, 2006;

6. the Defendant Exmark Manufacturing Company, Inc.'s "Reply Memorandum . . ." (document #62) filed on November 1, 2006; and

2. the Defendants Outdoor Equipment Distributors, Inc., Robert L. Zucker, Jr., Matthew J. Machtay, and Lori White's "Reply Brief . . ." (document #63) filed on November 3, 2006.

This matter was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and the Defendants' Motions are now ripe for the Court's consideration.

Having fully considered the arguments, the record, and the applicable authority, the undersigned will respectfully recommend that the Defendants' Motions to Dismiss be <u>granted</u>, as discussed below.

## I. <u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

This is an action seeking relief pursuant to the Sherman, Clayton and Lanham Acts, as well as several state law claims, including punitive damages. The Plaintiffs essentially allege that they were injured when other dealers were allowed to carry the Exmark brand of power equipment, when their customer information was shared with other dealers, and when their dealer agreement was cancelled.

Accepting the allegations of the Complaint as true, the Plaintiffs are involved in the retail business of selling and repairing power equipment. Specifically, Robert Pinkston owns both

Pinkston Sales & Service ("PS&S") and Pinkston's Lawnmower and Equipment, Inc. ("PL&E").[1] PL&E is a "reputable independent retail dealer of power equipment" and "is one of the largest and possibly the largest independent dealer in Charlotte, North Carolina."[2]

The Defendant Outdoor Equipment Distributors, Inc. ("OED")[2] purchases power equipment (residential mowers, commercial mowers, blowers, trimmers, edging equipment, tillers, chain saws, etc.) from large manufacturers, like the Defendant Exmark Manufacturing Company, Inc. ("Exmark"), and then sells the equipment to individual retailers such as PL&E, PS&S, and the Defendant STI Turf Care & Equipment, LLC ("STI Turf Care").

The Plaintiffs have been marketing and selling the Exmark brand of commercial power equipment since the early 1980s when OED introduced Exmark to the North Carolina market. For years, OED was PL&E's main distributor for Exmark and several other brands of equipment. "Since 1989, Randy Pinkston was the leading dealer of Exmark equipment in Central North Carolina, winning many top sales awards, including awards for ten consecutive years from 1994 through about 2004 from Defendant distributor OED and Exmark Manufacturing."[3] The Plaintiffs were "very, very successful Exmark dealers."

In the beginning of the OED and PL&E relationship, PL&E was led to believe that as long as their sales remained competitive, they would have the exclusive right to sell Exmark products in Mecklenburg County. Due to this verbal agreement, beginning in 1989 the Plaintiffs made

---

[1]PL&E was the business most directly involved in the actions which prompted this lawsuit as it serves Mecklenburg, Cabarrus, Union, Anson, and Stanley Counties. PS&S serves Anson and surrounding Counties. PS&S was allegedly injured, however, when Outdoor Equipment Distributors, Inc. cancelled its dealer agreement with PL&E because the agreement it had with PS&S was cancelled the same day.

[2]The Defendants Robert L. Zucker, Jr., Matthew J. Machtay, and Lori White are all employees of OED and throughout this Memorandum and Recommendation are referred to collectively as "OED."

[3]Randy Pinkston is the Plaintiff Robert Franklin Pinkston's son and is founder and president of PL&E.

substantial financial and time investments in their efforts to sell and repair the Exmark products.

However, PL&E has not always had the exclusive right to sell Exmark products in Mecklenburg County. For example, in 1995-96 another dealer began selling Exmark through OED. This continued until PL&E put forth the ultimatum that OED must either again make PL&E the exclusive dealer in Mecklenburg County or lose PL&E's business as to all of its product lines. OED then made the business decision to keep PL&E on its distribution list even if that meant limiting its Exmark sales to PL&E.

Another element of the OED, Exmark and PL&E relationship involved warranty cards filled out and sent to Exmark either by or on behalf of PL&E customers who purchased an Exmark product. The Plaintiffs believed there was a "firm understanding" that the "customer information was highly confidential and would not be used by Defendant Exmark for any reason other than warranty servicing, and would not be given by the manufacturer(s) to any third party."

The relationship between the parties continued along the same path until February of 2002 when PL&E signed an "Authorized Sales, Service, and Parts Dealer Agreement" with Exmark and OED. This Agreement contains several provisions relevant to the instant dispute.[4] First, in terms of duration of the Agreement, it states:

> This agreement covers the term commencing upon the date set forth below and ending on the next December 31 which is more than 90 days after the date of this Agreement, subject, however, to automatic renewal for twelve month periods unless this Agreement is cancelled as provided in the Standard Provisions. In addition, this

---

[4]The Agreement also contains a mediation and arbitration, forum selection and choice of law clause. The Plaintiffs argue that in spite of the terms of the Agreement that the arbitration clause is not binding and that North Carolina is the proper forum and choice of law. For the purposes of this Memorandum and Recommendation the undersigned has applied North Carolina law because even under the Plaintiffs' choice of law the claims do not survive. In regards to the arbitration clause, Exmark states that "in the interests of expeditiously and economically disposing of this case, Exmark joins in OED's Motion to Dismiss since plaintiffs have asserted no viable claims," but that it does not waive its rights under the mediation and arbitration clause.

Agreement shall terminate and expire at the end of any such twelve month period in which average annualized purchases of Authorized Products are less than $250 per annum. In any event, this Agreement may be terminated with or without cause by any party upon 30 days written notice given to the other parties.

Second, in terms of exclusivity, the Agreement states:

GENERAL TERMS AND CONDITIONS. EXMARK and DISTRIBUTOR hereby appoint DEALER as a non-exclusive authorized dealer in the Area of Primary Responsibility (hereinafter referred to as "APR") identified on the Signature Page. In consideration thereof, DEALER hereby commits to: (a) purchase, promote and resell, in DEALER'S APR, AUTHORIZED PRODUCTS and replacement spare parts for the AUTHORIZED PRODUCTS at retail, on a non-exclusive basis, from the locations as indicated on the Signature Page; (b) use its best efforts to build market share therefore; and (c) provide effective post sale service on all AUTHORIZED PRODUCTS, including warranty service, regardless of origin of purchase. This Agreement contemplates the purchase by DEALER of whole goods, accessories, service parts and attachments from DISTRIBUTOR pursuant to such terms, discounts, financing programs and conditions as DISTRIBUTOR shall independently establish and transmit from time to time. EXMARK is not selling, nor is it obligated by this Agreement or otherwise to sell, AUTHORIZED PRODUCTS to DEALER. It is DEALER'S obligation to obtain AUTHORIZED PRODUCTS from an EXMARK DISTRIBUTOR. All orders for AUTHORIZED PRODUCTS purchased from DISTRIBUTOR shall be subject to acceptance or confirmation only by DISTRIBUTOR. DEALER acknowledges and agrees that the non-exclusive APR designated herein is only for the term of this Agreement and that DEALER acquires no vested right to this APR with respect to its being a DEALER of EXMARK in the future.

In addition, with respect to the customer information provided through the warranty cards, the

Agreement requires that:

DEALER shall provide complete and accurate information, including, but not limited to, customer name, model number, serial number, customer address, and customer phone number, to EXMARK, pursuant to EXMARK'S specific guidelines, regarding all AUTHORIZED PRODUCTS sold or leased by DEALER within fourteen (14) business days of such sale or lease.

In terms of a performance goal and cancellation, the Agreement states:

Dealer shall achieve annual sales volumes of complete product line that meet market potential of APR in agreement with the DISTRIBUTOR and EXMARK. Market potential includes sales for personal residential use and to municipalities, schools and

universities, and professional landscapers.

. . .

TERMINATION OF AGREEMENT.  This Agreement shall terminate on the date indicated under "Duration" on the Signature Page, provided that this Agreement and all rights and privileges of the DEALER hereunder may be canceled and thereby terminated by any party with or without cause upon the mailing of a written notice of cancellation to the other parties at least thirty (30) days in advance of such cancellation.  For this purpose, notice to EXMARK shall be addressed to the principal office of EXMARK and notice to the DEALER shall be mailed to the last address for DEALER as appears on file with EXMARK.

TERMINATION OBLIGATIONS.  Absent specific evidence to the contrary, the parties hereto agree that no inference of conspiracy or agreement will result from discussions with other customers or distributors, or the receipt of information from them.  . . .

And, finally, the Agreement contains the following merger clause:

ENTIRE AGREEMENT: AMENDMENT.  This Agreement (consisting of these Standard Provisions and the Signature Page) constitutes the entire agreement of the parties with respect to the matters referred to herein and supersedes any prior or contemporaneous understanding or agreement with respect to the transactions contemplated.  This Agreement may be amended only by a written instrument executed by all of the parties to it.

The Agreement contains provisions contrary to what the Plaintiffs believed the substance of their prior oral agreements to be.  However, according to the Plaintiffs, they signed this Agreement after being told that the terms of their prior oral agreements would remain in force – in spite of the fact that those terms were directly contradicted by the written Agreement.  Mr. Pinkston states that because he is only a high school graduate he was easily induced into signing the written agreement.  More specifically, he argues that he should not be held to the terms of the Agreement because he "was not surrounded by a staff of MBAs and lawyers" when he signed it.

In any event, after the signing of the Agreement, the relationship between the parties began to mirror the terms of the written Agreement, and no longer those of the prior oral agreement.  The Plaintiffs lost their exclusivity when OED began supplying Steele Tree Company with all but one

of its product lines (all but the "Scag" line) in December 2002. Then, in the Fall of 2003, OED began selling Exmark to STI Turf Care. With the loss of revenue from the new competition, the Plaintiffs requested that OED also supply them with the Scag line of products, but OED refused the request. The Plaintiffs' sales began to fall in 2003. And the next big change came in September 2004, when OED began to place importance on the sales goals for the Plaintiffs (as explained in the Agreement – although OED did not refer to the Agreement when it addressed these goals with the Plaintiffs).

Due to all of the new competition with Exmark, the Plaintiffs decided to add the EverRide brand of commercial lawn mowing equipment to their inventory in early 2004. Upon learning this, OED communicated to the Plaintiffs that if they did not drop the EverRide line, they would begin selling Exmark to another competitor, Oakboro Tractor Company. The Plaintiffs refused to stop selling EverRide, and as stated, in August of 2004, Oakboro began carrying the Exmark line. Then in October of 2005, with the requisite thirty days written notice and not long after learning that the Plaintiffs had been awarded EverRide's "Number 1 National Dealer Award," OED cancelled the Exmark Agreement with the Plaintiffs, as well as other OED lines of products. In the cancellation letter, OED referred to the Plaintiffs' failure to meet the 2004 sales goals as the reason for the termination, in accordance with the terms of the written Agreement.

Following the cancellation, OED sent a memorandum to the "Charlotte Area Exmark Dealers" advising that OED would be mailing a flyer to "former Exmark retail customers of Pinkston's Lawn Mower." These addresses were obtained from the warranty information filled out by or on behalf of the Plaintiffs' customers. The Plaintiffs also allege that OED provided the customer address lists to all of its former Exmark competitors.

Finally, the Plaintiffs allege that "the actions of Defendants have in major part destroyed

Plaintiffs' business and credibility with respect to its commercial Exmark, Echo and other OED sold equipment, and has diverted many thousands of dollars of commercial power equipment business from Plaintiffs and caused massive lost profits starting in very late 2005."

The Plaintiffs' "Second Amended Complaint"[5] (document #49), filed on September 5, 2006, states nineteen federal and state law claims for relief, each discussed in Section IIC.[6]  On September 21, 2006, STI Turf Care and the OED Defendants filed their separate "Motions to Dismiss . . ." with supporting memoranda (document ##51-53).  On September 22, 2006, Exmark filed its ". . . Motion to Dismiss . . ." with supporting memorandum (document ##54-55).  The Plaintiffs then filed their "Memorandum in Opposition . . ." on October 24, 2006 (document #59).  And, as noted above, all three Defendants have replied to that Response (document ##61-63), rendering the subject Motions ripe for determination.

## II. DISCUSSION

### A.  Standard of Review

"A motion to dismiss under [Fed. R. Civ. P. 12(b)(6)] tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th

---

[5]Although not specifically stated, the undersigned assumes that the Plaintiffs intended to attach the same documents attached to their Complaint to their Second Amended Complaint, as they continue to refer to these documents in the Second Amended Complaint.

[6]The Plaintiffs' original Complaint (document #1) was filed on May 17, 2006.  The Plaintiffs then filed their first Amended Complaint (document #3) on May 31, 2006, as of right, prior to the time any of the Defendants filed an Answer or otherwise responded.  On July 12, 2006, all three sets of Defendants filed Motions to Dismiss (document ##23, 25-26).  The Plaintiffs initially responded to the Motions to Dismiss, but later sought leave to amend their Amended Complaint (document #39).  In light of the liberal standard for allowing a party to amend its Complaint, the undersigned allowed that request, and as such, recommended that the Motions to Dismiss be denied as moot (document #48).

Cir.), cert. denied, 510 U.S. 828 (1993), citing 5A C. Wright & A. Miller, Fed. Practice and Procedure §1356 (1990).

"A motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of [the subject] claim." McNair v. Lend Lease Trucks, Inc., 95 F.3d 325, 328 (4th Cir. 1996) (en banc), citing Rogers v. Jefferson-Pilot Life Ins. Co., 883 F.2d 324, 325 (4th Cir. 1989); and Johnson v. Mueller, 415 F.2d 354, 355 (4th Cir. 1969). Accord Republican Party of NC, 980 F.2d at 952 ("A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief") (internal citation omitted).

In considering a Rule 12(b)(6) motion, the complaint must be construed in the light most favorable to the nonmoving party, assuming factual allegations to be true. See, e.g., Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); Martin Marietta v. Int'l Tel. Satellite, 991 F.2d 94, 97 (4th Cir. 1992); and Revene v. Charles County Comm'rs, 882 F.2d 870, 872 (4th Cir. 1989).

## B. Validity of the Written Agreement

As all parties have acknowledged, the outcome of this lawsuit depends largely on whether the Plaintiffs are held to the Agreement which they signed. In order to avoid this conclusion, the Plaintiffs have essentially made three arguments: (1) the Agreement is an adhesion contract and not binding; (2) the Plaintiffs were fraudulently induced into signing the Agreement, making it void and unenforceable; and (3) the parties' course of dealing was contrary to the Agreement and essentially invalidated its contrary terms. For the reasons stated below, even taking the Plaintiffs' factual

allegations as entirely true, none of these arguments are meritorious as a matter of law.

First, the Plaintiffs argue that the Agreement amounts to an adhesion contract. Interestingly, the Plaintiffs attempt to invalidate the Agreement, yet at the same time have sought here to enforce certain of its provisions. For example, in Count One, the Plaintiffs complain that "Defendant OED breached both its 2002 contract and its duty of good faith and fair dealing as well by disclosing this customer list to the other enumerated Defendants and to third parties unknown to Plaintiffs." The Plaintiffs cannot have it both ways. See Simpson v. Snyder's of Hanover, 2006 WL 1642227, slip op. at *6 (W.D.N.C. June 12, 2006) (noting that a plaintiff cannot proceed both on a theory of breach of contract and on the premise that the same contract is an unenforceable adhesion contract). However, even ignoring this inconsistency, the Plaintiffs have not alleged facts sufficient to invalidate the Agreement.

There are simply no facts in the Second Amended Complaint to support the assertion that the Agreement is an unenforceable adhesion contract. The Agreement was hardly one entered into by an unsuspecting consumer – as the Plaintiffs stated more than once, they had been very successful. See AC Controls Co., Inc., v. Pomeroy Computer Resources, Inc., 284 F. Supp. 2d 357, 360-61 (W.D.N.C. 2003) (quoting Republic Mortgage Ins. Co. v. Brightware, 35 F. Supp. 2d 482, 484 (M.D.N.C. 1999) (finding that agreement was not an adhesion contract where it was negotiated between business entities)). Further, applying the language of a case quoted by the Plaintiffs, it is apparent that this Agreement is enforceable:

> A court will generally refuse to enforce a contract on the ground of unconscionability only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other.

Brenner v. Little Red School House, Ltd., 302 N.C. 207, 213, 274 S.E.2d 206, 210 (1981). Under

the standard cited by the Plaintiffs the Agreement must stand. There is no term in the Agreement which would "shock the judgment of a person of common sense." Two businesses entered into a mutually beneficial Agreement, in writing and very clear, and when it was no longer beneficial, the Agreement ended according to its own terms.

Next, the Plaintiffs argue that they were fraudulently induced into signing the Agreement, making it invalid. The elements of a fraud claim are: "(1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with the intent to deceive; (4) which the injured person reasonably relies upon; [and] (5) resulting in damage to the injured party." Strickland v. Lawrence, 627 S.E.2d 301, 306 (N.C. App. 2006) (citations omitted). The Plaintiffs argue that they were told that their oral exclusivity agreement would remain intact in spite of the contrary language in the Agreement they were being asked to sign. Even if this is true, it was not reasonable to rely on a contemporaneous statement which <u>directly</u> contradicted the written Agreement. See Allied Personnel of Raleigh, Inc. v. Alford, 25 N.C. App. 27, 30, 212 S.E.2d 46, 48 (1975) (finding it unreasonable to rely on oral statement which directly contradicted written agreement the defendant was asked to sign).[7] In addition, it is well settled in North Carolina that the parol evidence rule precludes a party "from offering evidence of [an] alleged oral agreement, which tends to contradict the written memoranda." Phelps v. Spivey, 126 N.C. App. 693, 697-98, 486 S.E.2d 226, 229 (1997) (finding that seller of property could not offer evidence of oral agreement that he could continue to use property when written memoranda unequivocally reflected that buyer held clear and unencumbered title); Ace, Inc. v. Maynard, 108 N.C. App. 241, 247-48, 423 S.E.2d 504, 508-09 (1992) (same).

---

[7]In addition, the <u>Allied</u> Court stated: "[t]here is no evidence that defendant was incapable of understanding the contract, or that plaintiff's conduct was of such a type as to deceive a person of ordinary prudence, or that any device was used to prevent defendant from reading the contract." Id. at 31, 212 S.E.2d at 49.

Further, none of the Defendants are in a fiduciary relationship with the Plaintiffs. Even under the definition offered by the Plaintiffs, there is no fiduciary relationship:

> Only when one party figuratively holds all the cards – all the financial power or technical information, for example – have North Carolina courts found that the "special circumstance" of a fiduciary relationship has arisen. By all lights, [Plaintiffs] are independent, sophisticated, if [] small business [people] who dealt with [Defendants] at arms' length and pursued their own business interests. [T]hese circumstances do not give rise to a fiduciary relationship.

Thomas v. Shelley's Jewelry, Inc., 127 F. Supp. 2d 779, 784 (W.D.N.C. 2000). The Plaintiffs are self-described "very, very" successful small businesses. The fact that Mr. Pinkston only has a high school education certainly does not render him so disadvantaged as to warrant the Court to impute a "fiduciary" relationship.

Finally, the Plaintiffs argue that the course of dealing between the parties invalidated the Agreement. It is true that the course of dealing between the parties prior to the signing of the Agreement was one where the Plaintiffs enjoyed exclusivity of sales territory. However, within months of signing the Agreement another dealer had been added to the Plaintiffs' territory. Thus, the question is whether the parties' course of dealing prior to the Agreement can alter its terms. In North Carolina, "evidence of prior and contemporaneous negotiations and agreements are not admissible to vary, add to, or contradict [a] writing" where the writing is a total integration. Smith v. Central Soya of Athens, Inc., 604 F. Supp. 518, 524 (E.D.N.C. 1985). As noted above, this Agreement is a total integration. It contains an explicit merger clause which states that the written Agreement "supersedes any prior or contemporaneous understanding or agreement with respect to the transactions contemplated." Thus, "[p]rior or contemporaneous evidence may only be admitted to clarify an ambiguity in a totally integrated written contract." Smith, 604 F. Supp. at 524. There is no ambiguity in the Agreement – it states in more than one place and quite explicitly that it is non-

exclusive.

Accordingly, the undersigned will respectfully recommend that the parties be held to the terms of their written Agreement.

### C. <u>Resolution of Claims for Relief After Determination that Agreement is Valid</u>

#### 1. <u>Counts One, Two, Eleven, Twelve and Thirteen (Trade Secrets)</u>

In these claims, the Plaintiffs argue that the customer information on the warranty cards completed either by the Plaintiffs or their customers, which was then sent to Exmark as required by the Agreement, constituted a "trade secret." And, the Plaintiffs further argue, when Exmark shared this information with OED, which then sent a flyer to all of the Plaintiffs' Exmark customers telling them where they could find other Exmark dealers and shared the information with STI Turf Care, all of the Defendants violated the Plaintiffs' property right to keep these customer lists confidential.

To the contrary, "[i]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." <u>Glaxo, Inc. v. Novopharm Ltd.</u>, 931 F. Supp. 1280, 1301 (E.D.N.C. 1996), quoting <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1002, 104 S. Ct. 2862, 2872 (1984). The Plaintiffs willingly disclosed this information to a third party, and in fact, were bound to do so by an integrated Agreement. The Agreement placed no obligation on Exmark to protect the confidentiality of the information; thus, Exmark had the right to disclose the information to OED for it to use as it saw fit. Accordingly, the undersigned will respectfully recommend that these claims also be dismissed.

#### 2. <u>Counts Three, Sixteen and Seventeen (the EverRide Products)</u>

Here, the Plaintiffs argue that the Defendants unlawfully attempted to coerce them into

dropping the EverRide line of products in an effort to eliminate any competition to the Exmark brand. The Plaintiffs cite the Clayton Act, Sherman Act, and North Carolina statutes in support of these claims.

The Clayton Act prohibits a seller from entering a contract for the sale of goods on the condition, agreement or understanding that the purchaser not sell the goods of the seller's competitor where the effect may be to substantially lessen competition or tend to create a monopoly. See 15 U.S.C. § 14. The facts as alleged by the Plaintiffs cannot support a Clayton Act claim for the simple reason that even under the Agreement the Plaintiffs were selling the goods of the Defendants' competitors. This arrangement proceeded until OED determined that the Plaintiffs were not able to successfully sell their product with the competitor's line in the same shop. In fact, the Plaintiffs sold both EverRide and Exmark in their shop from early 2004 until the Agreement was terminated due to low Exmark sales in October 2005. Further, "a mere refusal by a manufacturer to deal with a retailer who will not confine his dealings to the goods of the manufacturer does not run afoul of the [Clayton Act]." McElhenney Co. v. Western Auto Supply Co., 269 F.2d 332, 338 (4th Cir. 1959). Thus, the undersigned respectfully will also recommend that the claims under the Clayton Act be dismissed.

Next, the Plaintiffs allege a violation of Section 2 of the Sherman Act with the same facts used to support the claim under "the less exacting requirements of the Clayton Act." McElhenney, 269 F.2d at 339. The Plaintiffs' Sherman Act claim cannot succeed because they have not alleged facts which demonstrate that the allegedly unlawful conduct substantially affects interstate commerce. See McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 241, 100 S. Ct. 502, 508 (1980). "An antitrust claimant may establish the necessary connection with interstate commerce in either of two ways: by demonstrating that the alleged anticompetitive conduct occurred in

interstate commerce, or by showing that the conduct, though wholly intrastate, had a substantial effect on interstate commerce." Microsoft Corp. v. Computer Support Services of Carolina, Inc., 123 F. Supp. 2d 945, 952 (W.D.N.C. 2000). The Plaintiffs have alleged only that the Defendants' acts impacted competition in Mecklenburg County, and possibly, surrounding North Carolina counties.

Further, even if the Plaintiffs could prove that the alleged conduct affected interstate commerce, they have also failed to state a monopolization claim under Section 2. To state such a claim, the Plaintiffs must allege: "(1) that the defendant possesses monopoly power in the relevant market and (2) that the defendant willfully acquired or maintained that power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident." Cavalier Telephone, LLC v. Verizon Va., Inc., 330 F.3d 176, 183 (4th Cir. 2003). The Supreme Court has defined the term "monopoly" as "the power to control prices or exclude competition," which can be inferred from a "predominant share of the market." United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S. Ct. 1698, 1704 (1966). The Plaintiffs have not alleged facts to show any of these elements. First, it is evident that the Defendants did not have the power to exclude competition because the Plaintiffs state that they chose to continue selling EverRide rather than secure their position with Exmark. Second, no facts have been alleged that the Defendants ever attempted to control prices (or that price had anything to do with the conflict here at all) or that they ever actually did possess a predominant share of the market. Thus, the undersigned will respectfully recommend that the Sherman Act claim also be dismissed.

Finally, having found no violation of the Sherman Act, the undersigned will also respectfully recommend dismissal of the state law claims alleging the same violation. See Hester v. Martindale-Hubbell, Inc., 493 F. Supp. 335, 341 (E.D.N.C. 1980) (finding no violation of North Carolina

antitrust law where there were "no facts supporting a conspiracy or concerted activity in restraint of trade and in violation of the Sherman Act").

### 3. <u>Count Four (Civil Conspiracy)</u>

In this claim, the Plaintiffs allege that the Defendants conspired both to misappropriate the Plaintiffs' trade secrets and to cancel their Exmark dealership.  For the previously stated reasons, the Plaintiffs had no property right in their customer list and the Agreement was cancelled lawfully, according to its cancellation provision.  Thus, the undersigned will also respectfully recommend that this claim be dismissed.

### 4. <u>Counts Five, Six, and Seven (Oral Agreement)</u>

In all of these claims, the Plaintiffs make the argument that there was an oral agreement of exclusivity and that they were fraudulently induced to sign the Agreement based on this oral representation.  For the previously stated reasons, the undersigned will also respectfully recommend that these claims be dismissed.

### 5. <u>Count Eight (Duty of Good Faith and Fair Dealing)</u>

In this count, the Plaintiffs allege that the Defendants' conduct violated a duty of good faith and fair dealing.  However, as stated above, the Defendants' business decisions were clearly consistent with the terms of the Agreement, and therefore, the undersigned will also respectfully recommend that this claim be dismissed.

### 6. <u>Counts Nine and Ten (Tortious Interference)</u>

In these claims, the Plaintiffs allege that the Defendants interfered with the Plaintiffs ability to repair their customers' equipment by refusing to sell them Exmark parts.  Again, because of the clear terms to the contrary in the Agreement, these claims must also fail.  The Defendants cancelled the Agreement according to its terms; they were clearly <u>not</u> bound to sell the Plaintiffs the Exmark

parts indefinitely. Further, these claims assume that the Plaintiffs' customers were contractually bound to have their equipment repaired by the Plaintiffs, which is clearly not the case. Thus, the undersigned will also respectfully recommend dismissal of these claims.

### 7. <u>Counts Fourteen and Fifteen (Farm Machinery Agreement Act)</u>

In these claims, the Plaintiffs argue that the Defendants violated the Farm Machinery Agreement Act, N.C. Gen. Stat. § 66-182, by failing to provide a 90-day notice of termination of the Agreement, and by failing to provide the Plaintiffs with a 90-day right to cure any alleged deficiencies under the Agreement. However, the text of the statute reads differently than the Plaintiffs' Second Amended Complaint would lead one to believe, to wit:

> (a) Notwithstanding any agreement to the contrary, a supplier who terminates or otherwise fails to renew or substantially changes the competitive circumstances of an agreement with a dealer *without good cause* shall notify the dealer of the termination not less than 90 days prior to the effective date of the termination and shall provide a 60-day right-to-cure the deficiency. If the deficiency is cured within the allotted time, the notice is void. In the case where cancellation is enacted due to market penetration, a reasonable period of time shall have existed where the supplier has worked with the dealer to gain the desired market share. If there is any reason constituting good cause for action, the notice shall state that reason.

> (a1) Notwithstanding any agreement to the contrary, a supplier who terminates or otherwise fails to renew or substantially changes the competitive circumstances of an agreement with a dealer *for good cause is not required* to notify the dealer of the termination or to provide a right-to-cure the deficiency.

> (b) Notwithstanding any agreement to the contrary, a dealer who terminates an agreement with a supplier shall notify the supplier of the termination not less than 90 days prior to the effective date of the termination.

> . . .

N.C. Gen. Stat. § 66-182 (emphasis added). Thus, because the Defendants cancelled the Agreement for good cause (the decrease in sales) they were <u>not</u> statutorily required to provide a 90-day notice or a right to cure the deficiency. In addition, for the previously stated reasons, the cancellation was

performed according to the clear and unequivocal terms of the Agreement. The Plaintiffs merely needed to read the Agreement they signed to determine what would amount to "good cause" in this relationship (although, even without the Agreement, a decrease in the profitability of the relationship for both sides would amount to good cause to terminate the relationship from either perspective). Accordingly, the undersigned will also respectfully recommend that these claims be dismissed.

### 8. Count Eighteen (Trademark)

In this count, the Plaintiffs seek to have Exmark's trademark cancelled on the ground that Exmark has abandoned that trademark by allowing OED to use it without proper supervision.

> A trademark owner may grant a license and remain protected provided quality control of the goods and services sold under the trademark by the licensee is maintained. . . . Without adequate control of the licensee, a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark. . . . Because a finding of insufficient control essentially signals involuntary trademark abandonment and works a forfeiture, however, the proponent of a naked license theory "faces a stringent standard" of proof. . . . It must be noted that there need not be formal quality control where "the particular circumstances of the licensing arrangement [indicate] that the public will not be deceived." . . . On the other hand, there is no control requirement when a trademark owner consents to another party's defined usage of the trademark.

Moore Business Forms, Inc. v. Ryu, 960 F.2d 486, 489 (5th Cir. 1992) (internal citations omitted). In its brief, Exmark argues that this claim is "particularly frivolous," a characterization with which the undersigned agrees. The Plaintiffs appear to have added this claim to punish Exmark for what they perceive as a wrongful termination of their Agreement, albeit without alleging the necessary facts to meet the stringent standard of proof for this claim. Accordingly, the undersigned will also respectfully recommend that this claim be dismissed.

### 9. Count Nineteen (Punitive Damages)

Finally, the Plaintiffs argue that they are entitled to punitive damages. However, because the undersigned has concluded that the Plaintiffs substantive claims should be dismissed, an award of

punitive damages would be improper as a matter of law.  See Scott v. Kiker, 59 N.C. App. 458, 462, 297 S.E.2d 142, 145 (1982) (stating that "[p]unitive damages may not be awarded unless compensatory damages are awarded).

Accordingly, the undersigned will respectfully recommend that the Defendants' Motions to Dismiss be granted.

## III. RECOMMENDATION

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that the Defendants' Motions to Dismiss (document ##51, 52, and 54) be **GRANTED**; and that the Second Amended Complaint (document #49) be **DISMISSED WITH PREJUDICE**.

## IV.  ORDER

**IT IS ORDERED** that all further proceedings  in this action, including all discovery, are **STAYED**  pending  the  District Court's  ruling on  this Memorandum and Recommendation and Order.

## V. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same.  Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003);  Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990).  Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court.  Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005);  Wells v. Shriners Hosp., 109 F.3d 198, 201

(4th Cir. 1997); <u>Snyder</u>, 889 F.2d at 1365. Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. <u>Diamond</u>, 416 F.3d at 316; <u>Wells</u>, 109 F.3d at 201; <u>Page</u>, 337 F.3d at 416 n.3; <u>Thomas v. Arn</u>, 474 U.S. 140, 147 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 845-46 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties; <u>and to the Honorable Robert J. Conrad, Jr.</u>

**SO RECOMMENDED AND ORDERED.**

Signed: November 14, 2006

Carl Horn, III
United States Magistrate Judge